## BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION. | ) <br> )    MDL No. 2541 <br> ) <br> ) <br> ) |

## RESPONSE OF THE CONFERENCE DEFENDANTS IN OPPOSITION TO MOTION OF PLAINTIFF SHAWNE ALSTON FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF CALIFORNIA FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

Pursuant to Rule 6.1(c) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the five defendant athletic conferences, the Atlantic Coast Conference ("ACC"), The Big Ten Conference, Inc. ("The Big Ten"), The Big 12 Conference, Inc. ("Big 12"), the Pac-12 Conference ("Pac-12"), and the Southeastern Conference ("SEC") (collectively, the "Conference Defendants"), in the actions captioned *Alston v. National Collegiate Athletic Association, et al.*, No. 14-cv-01011 (N.D. Cal. filed Mar. 5, 2014, Wilken, J.) ("*Alston*") and *Jenkins, et al. v. National Collegiate Athletic Association, et al.*, No. 14-cv-01678 (D.N.J. filed Mar. 17, 2014, Wolfson, J.) ("*Jenkins*") submit this response in opposition to the motion of Plaintiff Shawne Alston ("Plaintiff Alston") for centralization of the *Alston* and *Jenkins* actions and transfer to the Northern District of California (the "Transfer Motion").

PRELIMINARY STATEMENT

The Conference Defendants oppose centralization of the *Alston* and *Jenkins* litigations. There are only two constituent actions in this proceeding. While both actions are putative antitrust class actions challenging NCAA eligibility rules, there are important differences between the two litigations that make the limited overlap between the proposed classes and

asserted claims unlikely to be meaningful in resolving the divergent, complex legal and factual issues presented in each of the cases. The *Alston* and *Jenkins* actions raise different issues, on behalf of different putative classes of student-athletes, and seek different relief to redress the injuries alleged.

The *Alston* action focuses on a narrow issue involving the maximum amount of financial aid allowed for athletic scholarships under the NCAA Bylaws, referred to as the cap on "grants-in-aid." The Bylaws currently cap the amount of an allowable "grant-in-aid" at the total cost of tuition and fees, room and board, and required course-related books at any given member college or university. Plaintiff Alston, on behalf of a proposed class that includes only student-athletes who played football while attending a member of one of the five Defendant Conferences over the past four years, argues that financial aid for athletic scholarships instead should be capped at an amount equal to the "full cost of attending school" at the respective member colleges and universities (the "Cost of Attendance").[1] *Alston* Compl. ¶¶ 2, 6, 289.[2] He seeks class-wide damages for the difference between the current cap on the total amount of an allowable grant-in-aid and the full Cost of Attendance, which he estimates to be "a few thousand dollars." *Id*. ¶¶ 2, 6.

The *Jenkins* Plaintiffs, on the other hand, challenge the antitrust legality of the NCAA amateurism requirements in their entirety. *Jenkins* seeks to enjoin *all* NCAA rules that place *any*

---

[1] The *Alston* Complaint alleges that the "Cost of Attendance" is an amount calculated and published by each college or university in accordance with federal guidelines, and that in addition to the cost of tuition and fees, room, board, and required course-related books which are included in the grant-in-aid, Cost of Attendance also typically includes expenses such as "supplies, transportation, and other expenses related to attendance at the institution." *Alston* Compl. ¶ 145.

[2] The *Alston* Complaint is Exhibit 1 to Plaintiff Alston's motion; the *Jenkins* Complaint is Exhibit 2.

limitation on remuneration that may be sought, offered or received by a student-athlete who is a member of either of the proposed classes of current Football Bowl Subdivision ("FBS") football and Division I men's basketball student-athletes, not just those who play at one of the Defendant Conferences' member colleges and universities. Unlike *Alston*, *Jenkins* does not seek monetary damages on behalf of the proposed class; it seeks only injunctive relief.

Therefore, each district court will engage in unique legal inquiries and analyses to resolve the distinct issues of law and fact presented in *Alston* and *Jenkins*. For example, a primary inquiry unique to *Jenkins* will be whether the complaint states a claim despite the longstanding United States Supreme Court precedent in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 101–02 (1984), that NCAA eligibility rules aimed at preserving amateurism in intercollegiate sports are lawful under the Sherman Act. *Alston*, on the other hand, narrowly questions only whether the specific restrictions on the grant-in-aid cap are legally permissible, and does not challenge the legality of eligibility restrictions altogether. Moreover, in *Alston* the district court will need to engage in a searching class certification analysis that includes whether Plaintiff Alston can satisfy the predominance requirements of Rule 23(b)(3) given the individualized proof required to establish alleged damages of putative class members. Because the *Jenkins* Plaintiffs seek certification under Rule 23(b)(2), the class certification analysis is different – Rule 23(b)(3) predominance issues are irrelevant, as is the need to sort through the issues presented if class-wide damages were sought.

The significant differences between the proposed classes, legal issues and relief sought in the two actions make consolidation inappropriate and centralization unnecessary. To the extent there exist overlapping discovery or other issues between the actions, the respective courts and the parties' legal counsel (most of whom are the same in the *Alston* and *Jenkins* actions) are

capable of managing them by coordination between the actions; transfer for centralization under the MDL rules is not required.

If the Panel were for any reason nonetheless inclined to order centralization of the actions, the Conference Defendants request that the actions be transferred to the Southern District of Indiana rather than the Northern District of California. The Southern District of Indiana, which is where the NCAA resides, has the greatest nexus to the alleged facts, is considerably more convenient for the parties and witnesses who overwhelmingly reside in the eastern half of the country, and has substantial experience in handling antitrust litigation involving the NCAA. Plaintiff Alston seeks transfer to the Northern District of California but has no connection to that district. Transfer of the *Jenkins* action to the Northern District of California would not be warranted.

STATEMENT OF FACTS

I.      The Parties and Likely Witnesses

The Conference Defendants are athletic conferences whose purpose is to serve their respective member colleges' and universities' educational goals by, among other things, providing student-athletes with the opportunity to compete at the highest level of intercollegiate athletics. *See* Declaration of Brad Traviolia ("Traviolia Decl.") ¶ 3; Declaration of Commissioner Lary Scott ("Scott Decl.") ¶ 3. Each Conference Defendant maintains its own headquarters and employees, separate from those of its members:

- The ACC is an unincorporated association located in Greensboro, North Carolina. *See* Declaration of John D. Swofford ("Swofford Decl.") ¶¶ 2, 4. The ACC employs 45 to 55 employees, all of whom with potentially relevant knowledge work out of the ACC's office in Greensboro. *Id.* ¶¶ 2–3. There are fifteen member colleges and universities in the ACC: Boston College, Clemson

4

University, Duke University, Florida State University, Georgia Institute of Technology, University of Maryland, University of Miami, University of North Carolina, North Carolina State University, University of Notre Dame, University of Pittsburgh, Syracuse University, University of Virginia, Virginia Polytechnic Institute and State University, and Wake Forest University. *Id.* ¶ 4. On July 1, 2014, the University of Maryland will withdraw from the ACC and the University of Louisville, located in Louisville, Kentucky, will join the ACC. *Id.*

- The Big Ten is a nonprofit corporation located in Rosemont, Illinois. *See* Traviolia Decl. ¶ 6. The Big Ten employs approximately 41 employees in its corporate office in Illinois, and two additional employees in its office in New York, New York. *Id.* ¶ 6. Currently, there are twelve member colleges and universities in The Big Ten: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska-Lincoln, Northwestern University, The Ohio State University, Pennsylvania State University, Purdue University, and University of Wisconsin-Madison. *Id.* ¶ 4. Two additional schools, Rutgers University and the University of Maryland, will join The Big Ten on July 1, 2014. *Id.* ¶ 5.

- The Big 12 is a Delaware nonprofit corporation located in Irving, Texas. Declaration of Robert A. Bowlsby, II ("Bowlsby Decl.") ¶ 2. The Big 12 employs 30 employees in Irving, Texas. *Id.* ¶ 3. There are ten member colleges and universities in the Big 12: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma,

Oklahoma State University, University of Texas, Texas Christian University, Texas Tech University, and West Virginia University. *Id.* ¶ 6.

- The Pac-12 is an unincorporated association located in Walnut Creek, California. *See* Scott Decl. ¶¶ 3–5. The Pac-12 employs approximately 45 employees in Walnut Creek, California. *Id.* ¶ 4. There are twelve member colleges and universities in the Pac-12: University of Arizona, Arizona State University, University of California, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California, Los Angeles, University of Southern California, University of Utah, University of Washington, and Washington State University. *Id.* ¶ 5.

- The SEC is an unincorporated association located in Birmingham, Alabama. *See* Declaration of Michael L. Slive ("Slive Decl.") ¶¶ 2, 4. All of the SEC's approximately 30 to 35 employees are located in its Birmingham office. *Id.* ¶ 2. There are fourteen member colleges and universities in the SEC: University of Alabama, University of Arkansas, Auburn University, University of Florida, University of Georgia, University of Kentucky, Louisiana State University, University of Mississippi, Mississippi State University, University of Missouri, University of South Carolina, University of Tennessee, Texas A&M University, and Vanderbilt University. *Id.* ¶ 4.

Defendant NCAA is a non-profit educational organization whose purposes include promoting intercollegiate athletics programs as an integral part of the educational experience for student-athletes. *See Alston* Compl. ¶¶ 48, 124–126. The NCAA is located in Indianapolis, Indiana, where it employs a staff of over three hundred individuals. *Id*. ¶¶ 48, 53. Each of the

Conference Defendants and their respective member colleges and universities are members of the NCAA.  *Id.* ¶ 48.

Plaintiff Shawne Alston, who filed suit in the Northern District of California, has no connection whatsoever with California:  he alleges that he is a resident of Virginia, and he attended undergraduate school at West Virginia University.  *Alston* Compl. ¶ 18.  His complaint states that he received athletic scholarship offers from West Virginia University, East Carolina University, University of Illinois, University of Maryland and Pennsylvania State University.  *Id.* ¶ 20.  Alston does not allege that he currently lives, or ever lived, in California; nor does he allege that he received an offer of an athletic scholarship from any California school or that he has any other personal connection to California.  *See id.* ¶¶ 18–47.

The plaintiffs in the *Jenkins* litigation are all current student-athletes.  *Jenkins* Compl. ¶ 2.  They attend universities in New Jersey, where *Jenkins* was filed, and in South Carolina, Texas, and California.  *Id.* ¶¶ 15, 17, 19, 21.

II.      Putative Classes and Claims Asserted

Plaintiff Alston and the *Jenkins* Plaintiffs sue on behalf of different putative classes and pursue different relief for the claims they assert regarding the NCAA's Bylaws.

Plaintiff Alston seeks to represent a class of "all persons who received athletic grants-in-aid . . . for participation in college football from a college or university that is a member of the [Conference Defendants], at any time between four (4) years prior to the filing of this Complaint, and the date of judgment in this matter."  *Alston* Compl. ¶ 289.  The *Alston* action claims the defendants conspired in violation of the Sherman Act to impose unlawful, anti-competitive restraints on a purported college football labor market by maintaining and abiding by the NCAA Bylaw that imposes a cap on the value of grant-in-aid scholarships available to student-athletes,

which allegedly is below the Cost of Attendance.  *Id.* ¶¶ 4, 5.[3]  The *Alston* action seeks relief on

behalf of the proposed class, including "an injunction that enjoins the NCAA and the Power

Conference Defendants from maintaining and abiding by the present NCAA Bylaw that limits

financial aid to the presently-defined [grant-in-aid cap]" and "an award of damages for the

difference between the grants-in-aid awarded and the Cost of Attendance."  *Id.* ¶ 6.

The *Jenkins* Plaintiffs seek to represent two classes distinct from the proposed *Alston*

class, consisting of (1) all NCAA Division I FBS football players, and (2) all NCAA Division I

men's basketball players, in both cases who were offered or received a full grant-in-aid at any

time starting from the filing of the Complaint.  *Jenkins* Compl. ¶ 28.[4]  The *Jenkins* action alleges

that the NCAA's requirements that college athletes be amateurs in order to be eligible to

compete in collegiate sports violates the Sherman Act, and seeks to remove all restrictions on the

payment of cash and any other remuneration to student-athletes for their participation in FBS

---

[3] *Alston* also attempts to assert a claim against the NCAA and the Pac-12 that the same alleged conduct violates California's Unfair Competition Law in that it violates "the policy and spirit of the California's Student Athlete Bill of Rights, as well as the policy and spirit of federal and California antitrust law" (*id.* ¶ 339), but Alston, a non-resident of California with no contacts with the state has no standing or substantive basis to assert such a claim.

[4] The *Jenkins* Complaint describes the proposed classes as: (1)

> any and all NCAA Division I Football Bowl Subdivision ("FBS") football players who, at any time from the date of this Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid

(*Jenkins* Compl. ¶ 27); and (2)

> any and all NCAA Division I men's basketball players who, at any time from the date of this Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid

(*id.* ¶ 28).

college football and Division I men's basketball. *Id.* ¶¶ 2–8. The *Jenkins* Plaintiffs seek on behalf of the putative class only injunctive relief enjoining the NCAA and the Conference Defendants from restraining their member colleges and universities from "negotiating, offering, or providing remuneration to members of the [proposed classes] in compensation for their services as athletes." *Id.*, Prayer for Relief ¶ 2.[5]

## III.     Other Pending Litigations

In addition to the *Alston* and *Jenkins* actions, there are two antitrust class action lawsuits currently pending against the NCAA in which the Conference Defendants are not parties. Both of those other actions are in advanced procedural stages.

*Rock v. National Collegiate Athletic Association*, No. 12-cv-1019 (S.D. Ind. filed July 25, 2012, Magnus-Stinson, J.), is a putative antitrust class action, which like *Alston* and *Jenkins* challenges NCAA Bylaws that place restrictions on the athletic scholarships available to student-athletes. The specific NCAA Bylaws at issue in *Rock* prohibited multi-year athletic scholarships and cap the number of student-athletes to whom NCAA member colleges and universities may provide grants-in-aid in a given school year. The NCAA is the sole defendant. The *Rock* litigation is essentially the same litigation as the now-dismissed *Agnew v. National Collegiate Athletic Association*, No. 11-cv-0293 (S.D. Ind.), which was originally filed in the Northern District of California (No. 10-cv-04804) and transferred, pursuant to 28 U.S.C. § 1404(a), to the Southern District of Indiana over the plaintiff's objection. Order Granting Defendant's Motion to Transfer Venue, *Agnew*, No. 10-cv-04804 (Feb. 22, 2011), Dkt. No. 64. The District Court in Indiana, the Honorable Jane Magnus-Stinson presiding, then dismissed the action for plaintiff's failure to state a claim. 2011 U.S. Dist. LEXIS 98744 (S.D. Ind. Sept. 1, 2011), *aff'd*, 683 F.3d

---

[5] The individual named *Jenkins* Plaintiffs also seek money damages and treble damages on behalf of themselves only. *Id.*, Prayer for Relief ¶ 3.

328 (7th Cir. 2012). *Rock* was filed months after the Seventh Circuit affirmed dismissal of

*Agnew*. 683 F.3d at 347–48; Compl., *Rock*, No. 12-cv-1019 (July 25, 2011), Dkt. No. 1. *Rock* is

currently in discovery, which is set to close July 29, 2014; no class has been certified at this time.

*See generally* Dkt., *Rock*, No. 12-cv-1019. Judge Magnus-Stinson, who presided over *Agnew* at

the district court level, is presiding over the *Rock* matter. *See generally id.*

    *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. 09-cv-1967

(N.D. Cal. filed May 5, 2009, Wilken, J.) ("*Student-Athlete Name and Likeness*"), is currently

pending before the Honorable Claudia Wilken in the Northern District of California. *Student-

Athlete Name and Likeness* does not involve the NCAA's financial aid rules; it is a consolidated

proceeding involving antitrust and right-of-publicity claims arising out of a purported conspiracy

regarding the alleged use of certain student-athletes' names, images and likenesses. Electronic

Arts, Inc. and Collegiate Licensing Company, neither of which is a defendant in *Alston* or

*Jenkins*, are defendants in *Student-Athlete Name and Likeness*, along with the NCAA. An

injunctive relief class was certified in *Student-Athlete Name and Likeness* on November 8, 2013.

*See* Order Granting in Part and Den. in Part Mot. for Class Certification, *Student-Athlete Name

and Likeness*, No. 09-cv-1967 (Nov. 8, 2013), Dkt. No. 893.[6] Trial is scheduled to begin on June

---

[6] The class certified in *Student-Athlete Name and Likeness* is defined as follows:

> All current and former student-athletes residing in the United States who compete
> on, or competed on, an NCAA Division I (formerly known as "University
> Division" before 1973) college or university men's basketball team or on an
> NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006)
> men's football team and whose images, likenesses and/or names may be, or have
> been, included in game footage or in videogames licensed or sold by Defendants,
> their co-conspirators, or their licensees after the conclusion of the athlete's
> participation in intercollegiate athletics.

Order Granting in Part and Den. in Part Mot. for Class Certification at 5, *Student-Athlete Name
and Likeness*, No. 09-cv-1967 (Nov. 8, 2013), Dkt. No. 893.

9, 2014.  Order on Defs.' Mot. to Strike at 5, *Student-Athlete Name and Likeness*, No. 09-cv-1967 (Jan. 29, 2013), Dkt. No. 673.

<u>ARGUMENT</u>

I.    **CENTRALIZATION OF THE *ALSTON* AND *JENKINS* LITIGATIONS IS NOT APPROPRIATE; COORDINATION BY THE COURTS AND COUNSEL WOULD BE SUFFICIENT TO ENSURE EFFICIENT ADMINISTRATION OF THE ACTIONS**

Where, as here, "only a minimal number of actions are involved, the moving party generally bears a heavier burden of demonstrating the need for centralization." *Foley v. Transocean Ltd. (In re Transocean Ltd. Sec. Litig.)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010); *see also Haverty v. Mabus (In re Removal from U.S. Marine Corps Reserve Status List Litig.)*, 787 F. Supp. 2d 1350, 1351 (J.P.M.L. 2011) ("given that only two actions are pending, we consider voluntary coordination among the parties and the involved courts to be a preferable alternative to centralization").  Plaintiff Alston cannot meet this burden.  In addition to the ease of informal coordination available when there are only two constituent litigations, additional factors weigh against centralization.

There are the same six defendants in both of these actions, and the primary counsel for each of the five Conference Defendants is the same in both cases.  *See Alston* Dkt.; *Jenkins* Dkt. Under these circumstances, informal coordination between the courts in which the cases currently are pending and cooperation among the parties and their counsel "is practical and preferable." *In re Beecher Estate Litig.*, 816 F. Supp. 2d 1379, 1379 (J.P.M.L. 2011) (denying transfer where movants were represented by the same attorney and a single law firm represented a plaintiff who opposed transfer).

Moreover, the proposed classes and claims asserted and relief requested in the *Alston* and *Jenkins* actions differ in important respects that make centralization inappropriate. *In re Fresh*

*Dairy Prods. Antitrust Litig. (No. II)*, 959 F. Supp. 2d 1361, 1362 (J.P.M.L. 2013) (denying

centralization where putative classes in two actions did not overlap). Whereas Plaintiff Alston

seeks to represent a damages and injunction class made up substantially of *former* FBS college

football student-athletes, the *Jenkins* Plaintiffs seek to represent an injunction-only class

comprised entirely of *current* student-athletes, in both FBS college football and Division I men's

basketball. *Compare Alston* Compl. ¶ 289, *with Jenkins* Compl. ¶¶ 27–28. The substantive

claims and relief sought also diverge. The crux of the *Alston* Complaint is that the current

"grant-in-aid" cap deprives student-athletes of receiving an athletic scholarship that would cover

the actual Cost of Attendance at schools within the five Defendant Conferences. *Alston* Compl.

¶ 5. *Alston* thus seeks to enjoin the NCAA and the Conference Defendants only from

maintaining "the presently-defined" grant-in-aid cap and for recovery of purported damages for

the alleged shortfall between the grants-in-aid awarded and the Cost of Attendance, which

Plaintiffs estimate to be several thousand dollars per student, per year of attendance. *Id*. ¶¶ 5–6.

The *Jenkins* Plaintiffs, in contrast, challenge the legality of a defining characteristic of a

unique "product" – college athletics – which the United States Supreme Court described as

follows:

> The identification of this "product" with an academic tradition differentiates
> college football from and makes it more popular than professional sports to which
> it might otherwise be comparable, such as, for example, minor league baseball. In
> order to preserve the character and quality of the "product," athletes must not be
> paid, must be required to attend class, and the like.

*Bd. of Regents of the Univ. of Okla.*, 468 U.S. at 101–02. *Jenkins*, therefore, challenges the

continued legality of the amateur eligibility requirements of collegiate athletics despite the

Supreme Court's prior rulings that those requirements "are justifiable means of fostering

competition among amateur athletic teams and therefore procompetitive because they enhance

public interest in intercollegiate athletics." *Id*. at 117. The *Jenkins* Plaintiffs seek a declaration that those amateur eligibility requirements violate the Sherman Act, an injunction against enforcement of all NCAA Bylaws related to those requirements, and an injunction prohibiting defendants from restraining their member colleges and universities from providing unlimited remuneration to student-athletes. *Jenkins* Compl. at p. 41, Prayer for Relief.

In his Transfer Motion, Plaintiff Alston overstates the similarities between *Alston* and *Jenkins* by identifying "multiple common questions of law and fact" between the two cases, such as whether the Sherman Act was violated, the appropriate level of antitrust scrutiny to be applied by the courts, whether class action treatment is appropriate and whether injunctive relief is appropriate. Transfer Motion at 4. These general inquiries are common to any two antitrust purported class actions, and they do not justify centralization. For instance, within the broad inquiry relevant to whether the conduct alleged violates the Sherman Act, *Alston* and *Jenkins* allege different anti-competitive conduct. Plaintiff Alston alleges that the current grant-in-aid cap violates the Sherman Act because of *where* defendants set the cap; *Jenkins* asserts that the basic eligibility rules that define collegiate athletics are themselves unlawful.

Where there are factual issues that overlap, the parties are capable of identifying them and, with the courts' assistance if necessary, coordinating discovery in the cases.

## II. IF THE PANEL WERE INCLINED TO CENTRALIZE THE *ALSTON* AND *JENKINS* LITIGATIONS, THE SOUTHERN DISTRICT OF INDIANA WOULD BE THE MOST APPROPRIATE TRANSFEREE COURT

For the foregoing reasons, the Conference Defendants strongly believe that centralization of these cases is not appropriate. In the event the Panel were to conclude that centralization is necessary, the most appropriate court to which the actions could be transferred would be the Southern District of Indiana, not the Northern District of California as the Transfer Motion requests. The Southern District of Indiana, where the NCAA is located and where *Rock* is

pending, has the greatest local interest in the litigations, is most centrally located to the parties and likely witnesses, is a far more convenient, and fairer, location in which to litigate the claims, and would promote a more efficient utilization of judicial management and resources.

Of all the parties in both litigations, only Plaintiff Alston seeks to proceed in the Northern District of California, and he has no connection with that district or any substantive interest in having these cases litigated in California. Indeed, of all of the defendants in both actions, only the Pac-12 has a presence in or near California. In contrast, the Southern District of Indiana is centrally located, making it the most geographically convenient location by far for the largest number of parties in the two actions.[7] And, although neither plaintiff group chose to file their action in the Southern District of Indiana, the districts in which they chose to file have little connection to the subject matters of the lawsuits, and neither is a more appropriate forum for the litigation than the Southern District of Indiana. Transfer Order at 2 n.2, *In re Nutramax Cosamin Mktg. & Sales Practices Litig.*, MDL No. 2498, (J.P.M.L. Dec. 17, 2013), Dkt. No. 27; *In re: BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d 1376, 1379 (J.P.M.L. 2010). Here, as in both *Nutramax* and *BP*, the parties and putative class members are scattered nationwide, making the plaintiffs' choice of forum not a controlling factor. In addition, these actions are in their infancies and, subject to the courts' approval of the parties' proposed stipulations, both actions will be stayed pending the Panel's decision, so there will be minimal chance for disruption in the event of transfer to a new district. *BP*, 734 F. Supp. 2d at 1379. For the reasons set forth more fully below, the Southern District of Indiana is the most appropriate forum to preside over the litigations if the cases are to be transferred.

---

[7] Indeed, the central location of Indianapolis is one of the reasons the NCAA has its offices there. Slive Decl. ¶ 9.

A.    Indiana Has a Strong Nexus to the Issues; California Has Minimal Local Interest

Although they pursue different claims, both *Alston* and *Jenkins* challenge NCAA Bylaws.
The NCAA is located in Indianapolis, and if any single forum has the greatest local interest in
the allegedly unlawful activity pled in these actions, it is the Southern District of Indiana. The
rest of the parties and interested parties are scattered throughout the country, though heavily
weighted in the Midwest, South, Southeast and East. The Northern District of California has no
greater local interest in these litigations than any other district court across the country where the
Conference Defendants can be found. Judge Jeffrey White, the United States District Judge for
the Northern District of California who transferred the *Agnew v. NCAA* litigation from that
district to the Southern District of Indiana, also recognized that Indianapolis has a much more
significant local interest in litigations challenging NCAA rules than do the district courts where
member colleges or universities are located. *See* Order Granting Defs.' Mot. to Transfer Venue
at 6, *Agnew*, No. 10-cv-04804, Dkt. No. 64.[8] The same rationale applies here.

B.    The Southern District of Indiana Is the Most Convenient Forum for the Parties
and Likely Witnesses

The Northern District of California is an inconvenient location for almost all the parties
and likely witnesses to this suit. The sole plaintiff who filed suit in California – Shawne Alston

---

[8] Specifically, Judge White reasoned:

> NCAA is headquartered in Indianapolis and most of its employees live and work
> there. Thus Indiana has a strong interest in this litigation. Agnew does not reside
> in California but suggests that California has an interest in this litigation because
> many of the NCAA member schools are located in California and the NCAA
> policy decisions at issue in this case are the result of agreements among the
> NCAA's member schools. As Agnew acknowledges, however, the member
> schools "are dispersed throughout the United States," giving California no greater
> interest in this litigation than other states. (Pl's Opp. to Def's Mot. to Transfer
> Venue at 7.) NCAA has demonstrated that Indiana has the stronger interest in
> litigating this action.

Order Granting Defs.' Mot. to Transfer Venue at 6, *Agnew*, No. 10-cv-04804, Dkt. No. 64.

– has no connection to California and has pled no set of facts in California related to his individual claim. The sole California-based factual allegations in the *Alston* Complaint relate to defendant Pac-12 Conference, with which Alston has no relationship. All of the other Conference Defendants are located in the middle, southeastern and eastern sections of the country and Indianapolis is centrally located to all of them: the ACC is headquartered in Greensboro, North Carolina, The Big Ten in Rosemont, Illinois, the Big 12 in Irving, Texas, and the SEC in Birmingham, Alabama.

Plaintiff Alston's argument that the Northern District of California is the most convenient location entirely ignores the tremendous inconvenience it imposes on the parties and likely witnesses, and relies entirely on the assertion that the district is "convenient" because there are three nearby airports and it is "in an area with an abundance of hotels, taxis, rental cars, and other necessary litigation resources." Transfer Motion at 7. That it is possible to travel in and out of the Northern District of California does not make it convenient for the majority of parties and witnesses to cross most of the country to do so, or, for that matter, distinguish the district from any other in which a major airport and hotels exist. Plaintiff Alston ignores the patent unfairness involved in requiring the overwhelming majority of parties and witnesses, which are located primarily in the Midwest, South and East, to spend hours travelling across the country.

The demonstrative map attached as Exhibit 1 illustrates the inequity in making the parties litigate in California.[9] As the map shows, the heavy concentration of parties, including plaintiffs,

---

[9] The map attached as Exhibit 1 shows the approximate locations of: the residences of Plaintiffs Jenkins, Moore, Perry, Tyndall, and Alston; the headquarters of the NCAA; the offices of the Conference Defendants; and the Conference Defendants' member colleges and universities. The Plaintiffs' places of residence are designated by the initial letter of each Plaintiff's last name. *See Jenkins* Complaint ¶¶ 15, 17, 19, 21; *Alston* Complaint ¶ 18. The NCAA's office in Indianapolis, Indiana is designated by the NCAA's logo. *See* Slive Decl. ¶ 9. The headquarters of the Conference Defendants are designated by each conference's logo, and the locations of the

is in the eastern half of the country, and for most parties the Northern District of California is approximately 2,000 miles or more from where they reside. So, for example, in order to get to the Northern District of California, Conference Defendants located in the East and Southeast, and their members would have to make at least one stop before getting to California in a trip that would take at least one full day of travel time – each way. Slive Decl. ¶¶ 7–8; Swofford Decl. ¶¶ 2, 4. Centralizing these actions in the Northern District of California cannot be justified on convenience grounds given the geographic distribution of the parties and likely witnesses in these actions.

Indeed, the Northern District of California itself recognized in the *Agnew* antitrust litigation against the NCAA that the convenience of the parties weighed strongly in favor of transfer to the Southern District of Indiana. In granting the NCAA's motion to transfer the litigation to the Southern District of Indiana, Judge White recognized that the Southern District of Indiana would be more convenient for parties and witnesses and that most of the documentary evidence was located there, in addition to the previously noted factor that Indiana had a stronger local interest in the litigations and two other factors – familiarity with applicable law and docket congestion – that were neutral. *See* Order Granting Defs.' Mot. to Transfer Venue at 4–8, *Agnew*, No. 10-cv-04804, Dkt. No. 64.[10] In contrast, the only parties to these actions located in

---

Conference Defendants' member colleges and universities are designated by a smaller, grayscale version of each conference's logo. *See* Swofford Decl. ¶¶ 2, 4; Traviolia Decl. ¶¶ 4, 6; Bowlsby Decl. ¶¶ 2, 6; Scott Decl. ¶¶ 4, 5; Slive Decl. ¶¶ 2, 4.

[10] This fact also distinguishes the instant action from the Northern District of California's decision not to transfer one of the consolidated actions from the *Student-Athlete Name and Likeness* litigations. In that action, the court declined to transfer because that forum was the most convenient for Electronic Arts, Inc., then a third party witness, which is headquartered in the Northern District of California. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, No. C 09-3329 CW, 2009 WL 4899217, at *2 (N.D. Cal. Dec. 11, 2009) (denying motion pursuant to 28 U.S.C. 1404(a) to transfer to Southern District of Indiana).

the Northern District of California, the Pac-12 and William Tyndall, one of the *Jenkins* plaintiffs, both agree that transfer to the Northern District of California would not be in the collective interests or convenience of the parties.

      C.     **The Southern District of Indiana Is the Most Efficient Forum to Hear These Litigations**

Judge Magnus-Stinson in the Southern District of Indiana has substantial experience with NCAA-related antitrust issues. In fact, as between *Rock* and *Student-Athlete Name and Likeness*, the issues being litigated before Judge Magnus-Stinson in the *Rock* litigation are more similar to the separate issues raised in *Alston* or *Jenkins* because the primary focus of *Student-Athlete Name and Likeness* is the alleged use of student-athletes' names and likenesses in videogames and television broadcasts, while *Rock* focuses on NCAA restrictions on grants-in-aid.

In addition, Judge Magnus-Stinson currently has no pending multidistrict litigations and the Southern District of Indiana has comparable docket congestion to the Northern District of California: 8.8 months from filing to disposition in civil cases and 34.7 months from filing to trial in the Southern District of Indiana compared with 7.8 months from filing to disposition in civil cases and 31 months from filing to trial in the Northern District of California.[11] There is only a single multidistrict litigation currently pending in the Southern District of Indiana and the Northern District of California has fifteen multidistrict litigations in addition to the consolidated *Student-Athlete Name and Likeness* action.[12]

---

[11] December 2013 United States District Court Judicial Caseload Profiles, available at: http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2013/district-fcms-profiles-december-2013.pdf (last visited April 9, 2014).

[12] March 13, 2014 MDL Statistics Report – Distribution of Pending MDL Dockets, available at: http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-March-13-2014.pdf (last visited April 9, 2014) (listing one multidistrict litigation in the Southern District of Indiana and fifteen in the Northern District of California as of March 13, 2014); Transfer Order 2, *In re Lidoderm Antitrust Litig.*, MDL No. 2521 (J.P.M.L. Apr. 3, 2014), Dkt. No. 76

<u>CONCLUSION</u>

For the reasons set forth above, the Conference Defendants submit that centralization of the *Alston* and *Jenkins* actions is not necessary or appropriate, and respectfully request that the Panel deny Plaintiff Alston's motion to centralize the litigations.  In the unlikely event the Panel were to conclude that centralization of the *Alston* and *Jenkins* actions is appropriate, the Southern District of Indiana would be the most appropriate transferee court.

Respectfully submitted,

Dated:          April 10, 2014          PROSKAUER ROSE LLP

By:     /s/ Scott P. Cooper
        Scott P. Cooper
        2049 Century Park East, Suite 3200
        Los Angeles, CA  90067-3206
        Telephone:  (310) 557-2900
        *Attorneys for the Pac-12 Conference*

Dated:          April 10, 2014          ROBINSON BRADSHAW & HINSON, P.A.

By:     /s/ Robert Fuller
        Robert Fuller
        101 North Tryon Street, Suite 1900
        Charlotte, NC 28246
        Telephone: (704) 377-2536
        *Attorneys for the Southeastern Conference*

---

(transferring a sixteenth multidistrict litigation to the Northern District of California after most recent MDL Statistics Report).

Dated:      April 10, 2014           MAYER BROWN LLP

By:   /s/ Andrew S. Rosenman
      Andrew S. Rosenman
      71 South Wacker Drive
      Chicago, IL 60606
      Telephone: (312) 701-8744
      *Attorneys for The Big Ten Conference, Inc.*

Dated:      April 10, 2014           SMITH MOORE LEATHERWOOD LLP

By:   /s/ D. Erik Albright
      D. Erik Albright
      300 North Greene Street, Suite 1400
      Greensboro, NC 27401
      Telephone: (336) 378-5368
      *Attorneys for the Atlantic Coast Conference*

Dated:      April 10, 2014           POLSINELLI PC

By:   /s/ Leane K. Capps
      Leane K. Capps
      2501 N. Harwood St., Suite 1900
      Dallas, TX 75201
      Telephone: (214) 397-0030
      *Attorneys for the Big 12 Conference, Inc.*

# EXHIBIT 1

